Please the court. Good morning. My name is John Klein and I represent the appellant, Mr. Colorado Cessa. I'll refer to him as Mr. Colorado. And I want to turn to the Brady issue in this case, which has become a central issue. The defense in this case at trial, this was a money laundering conspiracy case, and the defense was that Mr. Colorado never agreed with Zeta 40 or anybody else to launder money through the purchase of horses. There were two pillars to that defense. Mr. Colorado maintained through his counsel that he had used his own money to buy the horses that he bought. And he maintained that he did so out of fear of Zeta 40, who unquestionably was a brutal killer. Carlos Nayen was the government star witness in this case. Mr. Nayen attacked, I would say destroyed, both pillars of that defense. On the first pillar, the notion that Mr. Colorado spent his own money for these horses, Nayen testified that three truckloads of Zeta money, drug money, were delivered to Mr. Colorado's ranch, $2 million, $5 million, $10 million. There was no corroboration for this, no documentary evidence. And that evidence or testimony about cash payments does seem pretty explosive. And your point on the Brady is that disclosure of all the interview reports would have showed that he met seven times with agents before he ever mentioned that? It was on the seventh occasion that he began mentioning it. So six times. Yes. But at trial, you knew there were three occasions, and he was cross-examined on three occasions. So why is that marginal difference of three extra meetings where he didn't mention the cash payments, how does that get you to the materiality you need to show for a Brady violation? Well, in two ways. And the second way is materiality, of course, is cumulative, and so we have the fear part as well, which I'll get to in a minute. But just focusing on the cash payments, Nayan testified at trial that initially he didn't want to talk about Colorado and was hesitant to speak about him, and that's how he explained those three initial interviews. When it goes from three to six, spanning several months, it's a whole different picture. And it's also important to note that when he finally got around to talking about the cash payments, well, two things. One is the way he first described Colorado's purchase of horses for the Zetas was as a gift, which was essentially consistent with Colorado's own theory. So there was that affirmative exculpatory evidence at the beginning. Then there were six interviews where he says nothing about cash payments. Then when he starts talking about cash payments, the only one he mentions in that seventh interview is $2 million, and he doesn't describe it as a loan the way he did at trial. He describes it essentially as reimbursement. Only later, I think in July, so now we're at least one more interview down the line, does he talk about the $10 million. And when he talks about the $10 million, he places it at a significantly different time than he did in his trial testimony. In his trial testimony, he was adamant that it was April or May of 2011. In his statement, the first time he talks about the $10 million, he says it was before a certain horse auction in September of 2010. So the timing is way off. And then he never mentions in any of the nine interview memoranda that we have so far, he never mentions the $5 million, which was a significant part of his testimony at trial. So it's not just the difference between three and six, although I think that's a significant difference, given the way he explained the three. It is that even after he started talking about the cash payments, he talked about them in significantly different terms than he did at trial. And this is not a case where Nyan testified about cash payments and there were photographs and there were documents and deposit tickets. His testimony was uncorroborated. The jury either believed it or didn't. I have one more question on the Brady issue. This isn't the typical Brady claim where the government hid something and, you know, years after trial it's found in the desk drawer of the prosecutor, this document that wasn't produced. It was produced to the court for an in-camera review. The district court said, well, I don't think it's Brady material or Giglio. I'm not going to require it to be turned over. Obviously, you have the right to say that was incorrect. But what's the standard of review for a Brady claim when it was submitted to the district court for review? Clear error. And that's the only difference in terms of the notion of it being suppressed. Of course, you know, it's not a question of the good faith of the prosecutor. It was suppressed. It's just that it changes the standard of review. That's the only difference. But so we talked about pillar one of the defense, which was that Colorado used his own money, and we talked about the effect that Nyan's testimony had on that, and we talked about the interview memos that would have allowed us to challenge effectively that testimony. Let me talk about the second part, which was the fear. There was a lot of evidence in this case that Zeta-40 was a brutal killer. He killed, and he was particularly vicious toward people who had been friends of Zeta-14, who, in fact, he had killed. Zeta-40 had Zeta-14 killed. Zeta-40 then took over Veracruz for the Zetas. And Mr. Colorado had been unquestionably a friend of Zeta-14. There was no dispute about that. He was a horse racing friend and not a drug dealing friend, but he was a friend. And so when Zeta-40 had Zeta-14 killed, it was a sea change and a big upset in Mr. Colorado's life. So the question was what was the relationship between Zeta-40 and Mr. Colorado following the murder at Zeta-40's direction of Zeta-14? And Mr. Colorado's position at trial, of course, was that he was in fear of Zeta-40 from that first meeting in Tampico where he goes with his business colleague, Tavo. Tavo gets killed at the meeting, and Mr. Colorado comes back by himself. Our theory at trial was that from that point on, Mr. Colorado was in mortal fear of Zeta-40. The problem with that theory at trial was Nayen. Nayen was uniquely positioned to comment on this issue. He was very close to Mr. Colorado. He was very close after 2007 to Zeta-40. There was no one in a better position to comment on the relationship between those two than Mr. Nayen. And Mr. Nayen's testimony was that they were friends. He ridiculed at trial. He snorted at the notion that Mr. Colorado could have been afraid of Mr. — of Zeta-40 because they were friends. He was very adamant about that. Other people certainly had reason to fear Zeta-40. He killed a lot of people, and Nayen was quite clear about that. But not Mr. Colorado. They were friends. And he describes them exchanging gifts and attending parties together. Yeah, we know the record. Yeah. But, well, I guess it's a related question to the one you just got about the cash payments. Your own letter, the August 27 letter, suggests that you had been told with vague terms about this statement that they weren't true friends. We've been told in vague terms about a comment that Mr. Zeta-40 made at that 2007 meeting, right after Zeta-14 was killed. The problem with that, first of all, we asked — that was a discovery letter. And it was asking the government to provide us with the materials that supported that vague notion. We got nothing in return. It was in one of the 302s, as Your Honor now knows, but we didn't get that, and the judge didn't order it produced. If you've had a chance to read the cross-examination of Mr. Nayen, he wasn't asked about that, and there was a good reason for that. If you ask that question without anything to back it up, you don't have a 302, you have nothing in your hand, he's going to deny it, or there's a good chance he's going to deny it, and you're going to look like — Roberts. Now that you have, by virtue of our court's order, been able to look at the 500 pages or so of Special Agent Lawson, the whole — you are not saying that there was jinx that wasn't turned over, correct? Because technically — technically speaking, any of the writings were the special agents or the assistant U.S. attorneys, not Nayen's. Is that correct? I think that's right. Okay. So then if the issue is just Brady giglio, you also aren't complaining, I guess, of course, that they turned it all over in camera, because that was your request that they opposed. So the process of turning it over isn't an issue before us. It's not, although I will say that I think the — for an unrelated reason, I was reading the oral argument in Smith v. Cain, which is a Supreme Court Brady case, and there was criticism of that practice. And I don't think it's a great practice, because the district judge is never going to be in as good a position as the prosecutor. Right. But you had that, and you haven't made that an argument. We have not. In other words, the district court made its review and statement on the record after direct and never reiterates it after cross, recross, redirect. So there's nothing in the record that I could see that the district court even did the review or stated that he did, but that's not an issue you've presented to us. Well, no. The district court, it is in the record. The district court did say he had made the review. But at what point during Mr. Nyan's testimony did the district court make its only statement as to its review? I believe it was after his direct. Right. And my point is, wouldn't you have to do that after you've heard the witnesses' statements in their entirety? Well, ideally, I suppose, yes. But I think — Maybe what would help me most, now that you have all these records and you know what you asked on cross, is can you quote the portions of either your cross and the portions of the 500 pages that you would say are material exculpatory or impeachment? Yes. But you can — on the brief, it looked to me like you were saying it's the exculpatory features of cash payment and fear. I don't see in your brief any statement that there was extensive giglio material that you are claiming makes this reversible error. I believe there was extensive. You may believe it, but can you say in the brief where you argued that to us? Yes. And by giglio, I'm talking about inconsistent, prior inconsistent statements. Okay. Prior inconsistent. All right. Well, all right. That's the argument. But it's not that there was vastly more impeaching of this flip co-conspirator that you would have used when he's saying on cross, no, you're lying, no, that's not true. You would say, well, you're a lot worse than the government's portrayed you to be, and you're implicating my guy for being the worst, but in fact, you're a lot worse than anyone can imagine. Your Honor, there was not giglio in that sense. Okay. There was not giglio in the sense that it makes the witness look like he's more of a criminal than he's acknowledged. He was acknowledged being a big-time criminal. Okay. There was giglio, and I view prior inconsistent. Yeah, no, I agree completely. I just wanted to clarify. There was a lot of giglio in that sense. Yeah. There were prior inconsistent statements that were good enough. So besides the friend and the cash payment, what would you point to as the most material, least harmless giglio? If you're matching the verbatim notes that you now have with the cross, you were unable to do. Well, we were unable to cross-examine him about his prior inconsistent statements. I know, but give me the inconsistent, the specific of the inconsistent, because it's 500 pages. It's actually less than that, Your Honor. Not much less. The Jenks file? I don't think it's that much. I think it's more like 50 pages. Just the 302s for this gentleman. Right. I agree with that. Okay. So just the best example besides the true friends and the cash. Well, I think, I mean, there are other inconsistencies. I can give you some examples. The best one. But the friends and the cash. I know. I know that. But just give me the next best, because I think I really understand the record about those two. Okay. Okay. I've got a few here. Yeah. He testified early in the direct that he had met with the prosecutor five or six times, and the prosecutor, I think, brought that out in an effort to sort of minimize the amount of time that they'd spent talking about Mr. Colorado. In fact, as of December 18, 2013, he'd met with that prosecutor seven times, and that doesn't count the meetings that occurred in the following two years that we don't know about leading up to trial. So that was just false. And it was elicited by the prosecutor in an effort to show that there had not been any particular preparation. Mr. Nyan testified about attending a meeting in McAllen, Texas, between Mr. Hinojosa and Mr. Colorado. He went on about that at some length. There's no mention of that anywhere in the 302s. Mr. Nyan testified that when he first met with the agents, he didn't want to talk about Mr. Colorado. Well, in fact, he did talk about Mr. Colorado in each of the interviews, I think in each one. And I didn't see any statement in there where he's saying, I don't want to talk about Mr. Colorado. Okay. Those are two good examples. I can keep going. No, that's fine. But the reason I just want to emphasize, the reason we focused on the fear and the cash deliveries was that that was our defense. I mean, that was the heart of our defense in this case. Colorado spent his own money, and he did it out of fear of Zeta-40. We didn't have a defense other than that. That was it. He clearly bought the horses for the Zetas. And Nyan, he was like a wrecking ball aimed right at those two points. And if we'd had this material, we could have impeached him up one side and down the other and had exculpatory information as well. It was critical. I can't emphasize how important it was. And you think it would have made a difference in the verdict? Your cross-examination of this witness would have won the day. Well, I don't have to show that to win. I think there's a reasonable probability of a different outcome. Okay. A reasonable probability. I'm sorry. I'm overstating it. Yes. I also happen to think we would have won, but I don't have to show that to win the issue. Okay. Thank you. Thank you. Ms. Barringer. May it please the Court, Elizabeth Barringer from the Western District of Texas on behalf of the United States. Just to address a couple of things that were raised in Defense Counsel's Brady, I did want to point out that as far as the friend's comment, as was evident from the brief, this was a statement that the defendant was present for, so thereby it wasn't suppressed under Brady. I also want to say that while reasonable minds, of course, may differ about whether this evidence was favorable or whether this evidence was material, it wasn't clear error in this case. And Brown does state forth, say that, you know, this is going to be evaluated, the district court's decision, under the clear error standard. I have a question about that. I agree that when a court's looked at it, generally it's a clear error standard as the defense conceded. But did the district court make any finding on materiality? And the reason I don't think it did is because, remember, this wasn't post-trial. This wasn't a post-trial Brady motion. It was done in the middle of trial right after the witness's direct, I think, was when the court looked at it and ruled he wasn't going to turn over the memo. So how could there have been a materiality inquiry? I mean, a materiality inquiry requires looking at the entire trial and seeing would this have made a difference in the outcome. How can you figure that out mid-trial? I — the Court — well, first, to address the Court's answer, the Court didn't specifically say that it was assessing the materiality. But I think you can infer from the Court's statements that that's what it's doing, and this Court's case law supports that. There are cases saying when the Court — How do you judge materiality in the middle of the trial? I think, well, based on this Court's ruling, in one case, in one prior case, the Fifth Circuit found a court just saying, I'm going to leave it sealed, is that you can infer that the Court knew the law and that they were assessing the materiality. And I assume that we could infer that if the — what was in those reports became material, the Court would have unsealed those documents. So I think that this Court's case law supports that contention, that this district court was leaving it sealed because it had made a determination that it wasn't material. If we think it didn't decide materiality, then what's the standard of review? De novo? On the materiality part? I don't see on these facts how you could find that the Court didn't assess the materiality. I mean, that's the central issue of what the Court is determining when that's submitted in camera. And under Sipes — Well, I see where it's — I see where it says it's not favorable. It says nothing that could help you, nothing that could help you, a lot that could hurt you. And I think in that statement, it's sort of making the inquiry, is it material? Is it material? This Court — I mean, it was a lengthy trial, of course. The Court sitting through a lot of testimony is hearing over and over again how friendly the defendant was with the Zetas, over and over. You say nothing that could help you. That just sounds like the Brady half of the equation. Is there anything he said that said, I looked at this for impeachment value of him? No, he didn't say that directly, but I think the Court could ensure — So we have to infer both that he made a materiality assessment and that he understood that it includes Giglio, not just Brady? We have to infer that? I apologize for interrupting. According to its order, it said that it was going — How could he do that if the only time he says he did it was before the witness got close to finishing his testimony? Well, I assume the Court was continuing to evaluate the materiality. That continuing duty is on you. It's on the government, right? Any law that says it's not? There isn't any law that I can think of that says it's not the government's obligation to continue to turn over exculpatory or Giglio information as the trial goes on. The law is that it's in any format. That's the Department of Justice. I agree that the government has the continuing duty to do that, as did the district court. No, as to any format that the government has notes of statements of a witness in. That's true. So what we have here is the guy's — this flip witness that's the key change from trial number one. Well, I disagree with that, that he's the key witness at trial. I disagree with that. I think that Hinojosa was just as important. I don't think that Nyen was, like, the thing that made or broke this case at all. This would be a harmlessness argument. The only relevance to that statement of yours would be that this — there was Brady-Giglio error, but you're trying to say it's not that important. That wouldn't go to materiality. I don't think there's a harmlessness standard to Brady. I think it's all a materiality, and it's whether it put the whole case in some light. Let me just — if my assumption is that he's the key witness, am I correct on the following facts? His first interview is November of 2012. Correct. Then he's interviewed six more times before the first trial? Yes, although some of those interviews are occurring over the course of two days. So what we say interviewing — And it ended up being 302. So then — and that's three different federal agencies, FBI, DEA, and IRS. I don't know the agents who were present at each of them. No, agencies. No, agencies. I don't know if all of those agents had representatives at all those meetings. But the government's position was that in all of that, years of interviews, debriefing, three federal agencies, there's not a single Jenks statement made and not a single Brady legal statement made. Well, it's not Jenks because it was — Nyan never saw those reports, and it's not verbatim statements of what he said. It's the statements of Special Agent Larson, correct? It is. Larson's interpretation of the prosecutor's notes is — The 302s would be Jenks for Larson. That's how they were — Oh, Larson. Yeah, is that correct? Yes, but he did not testify. But he did at the first sentencing. The first sentencing he testified. Well, I don't know that I'd have to — He did testify at the first sentencing. Do you know whether any of that material was given over? I would have to review. There was no Jenks argument made in this case. It's not an issue before the court, so I'm not — I have not looked into what the facts are, and I would not want to misstate what was turned over. If he did testify at sentencing, and if they requested it, they would be owed under Jenks, correct? I would need to review the law before I would make a statement on that. That has not been raised before this court. So I would have to brief the issue, and I would have to consult with the prosecutor, and I would have to review his — Judge Walter's statement ordering you to turn them over in camera, did it have any time limitation to it? When he said turn over all similar interview memoranda, did it indicate any scope? No, but I'm confused what we're talking about. As far as the Jenks issue, there is no Jenks issue. No, put aside Jenks. If there's no — if your position is there's no Jenks because Nyon didn't adopt it and Lawson didn't testify, then we move — then you have a continuing Brady-Giglio no matter what. Yes. And that's what Walter says, turn over in his August 2015 order, months before the second trial. And that's when you did submit it. Yes. Okay. Yes. So did that order to the government say there's a scope only up and through December 2013? No. Okay. So it has to be the government's position that he was never interviewed after December 13 for two more years to the trial, or if he was, no one took notes. There's — I'm not saying no one took notes. I'm saying there are no further 302s or DEA-6s or any sort of memorandum on those pretrial interviews. And how did you construe his order to not require you to turn over notes that were taken? His order said that the government had to produce, and this is what was requested in camera, DEA-6s, 302s, or any sort of similar memoranda. I don't think any prosecutor in the world would consider that they would just as a matter of course turn over all of their trial prep notes that don't contain Brady or — So that doesn't make sense in this case, because you represented to us that all of the 302s, the only person that took notes were the trial prosecutors. There are no further 302s. Every 302 — No, no, no. Listen to my question. I'm listening. The 302s that were given to Judge Walters to comply with his order for all Brady Giglio, those 302s were composed based on only trial prosecutors' notes. That's your representation in the brief, that the only person that took notes were the government trial prosecutors. This is true. Okay. So if they then took more notes after 2013, how can you say, well, we don't owe anything to Walters because we just didn't tell the agents to generate 302s, whereas we had for two years before? Well, there's a difference. I have reviewed these notes in preparation for oral argument today. I haven't made a thorough Brady assessment of these notes, but they are very cryptic, very typical notes. They're undated notes, one-word jottings, work product all over the place, making notes in the margins of evidence that would corroborate. That may be, I'm sure, and, I mean, the government will say that. You've reviewed it. But Walters said, give me everything, and he didn't give a time date. Of course he was thinking up until the second trial. That's the relevant thing. And your answer is, well, we don't have 302s. But you made 302s out of government prosecutor notes to begin with. Then you stopped. That was the FBI's decision to make those notes pretrial. And second, Judge Walter did not order the government to do its trial notes. And I would just like to note, in the first trial, defense counsel did request the prosecutor's notes relating to one of the witnesses. That was the process. They have done that in the past to say, I actually want the notes from Mamito. And the government complied. The government turned over all of the notes. But as soon as they've finally gotten the 302s before our court, they said, of course we need the notes. Why would these notes, the notes are not discoverable. They're not, they don't. Well, they are. You cited the Brown case. They are if they're inconsistent with the 302s. But there's no showing here that those notes are inconsistent. How can they make that showing? But there's nothing in those notes. There's been no determination by the district court that those notes can be found. The district court didn't have them. Well, okay. If this is an issue, if the court would like the district court to evaluate those  those notes. Well, we'll decide if there's going to be a lien in it. And we'll decide the scope of it. I'm trying to understand how the government structured this case around Rule 16, 26-2 and Brady. And then the district court says, give me all Brady so I can look at it. And then when you look at it, tell me if the following facts are true. Okay. I'm going to ask you several specific facts. So the government attorneys wrote all notes for all the interviews that eventually ended up in the 302s. Correct? Yes. Okay. Is it true, then, that Special Agent Lawson, who wrote the 302s, had to write them from the notes of the prosecutor? I believe that's true. But he might have had also an independent recollection based on his attendance at the interview. Okay. Now, that's a real problem for you. When I look at his 302s, it doesn't suggest he was at any of the interviews. Do you have any reason to doubt that? I believe he was present at some of the interviews. Why would he have not put, when he indicates in paragraph number one, the following people were present? Why is his name not there, but in all the other 302s that were in the Jenks file, he indicates when he's present? I do not know whether he's present at all the meetings. So how could a man write a 302? And I've never seen Jenks law like this before in my life. How does an FBI agent write his report of interview, 10, 12 pages, single space, but he didn't even take notes? And he may not even have been there. He said in several of the reports that he did it based on the prosecutor's notes. Okay. Now, is it also true that the first time he writes the reports is half a year after the interview? This is true. So think what you've got here. You've got an FBI agent generating a report of an interview with extraordinary detail, but he wasn't at the interview. He didn't write notes of the interview, and he writes the memorandum that's given to Judge Walters half a year later? This is what Judge Walters reviews when sitting in the seat where he's evaluating all the testimony. And he reads these reports, a district court judge, and he finds that they are not material and they do not need to be unsealed. This is not the government making Brady error. This is the government complying with its obligation to hand these existing reports as it was instructed by the district court for them to make a decision about the materiality. Now, we have to go and review it all ourselves, right? That's the situation we're in. No, this is a clear error. Right. We have to assess there's no clear error. They do. And let me. We do. Let me give you some evidence of why this is not. Well, I don't know. I don't know. I'm going to ask if colleagues should interrupt too, because I'm taking a lot. But I want to last since you thankfully have read all the notes from day one, 2012 to the present. I cannot say that I have thoroughly read all of those notes. I said that I looked at them in preparation for oral argument. But you agree we have to assess if he made clear error. This court under Sipes and Skilling is the body that would examine those notes. It would be Judge Walter. Right. But we have to assess that he didn't miss material Brady Giglio. We have to confirm that. Well, I. That's what we did in Brown, the Fifth Circuit did. And also in Skilling. Right. This court said that. Anyway, let's assume that I think that's what we now have to do. So it would be helpful, and I'm grateful that you've read the notes. Let me ask you a few questions. Did the defense ever have information that Nyan told the government that he was receiving himself $5,000 a month from the Zetas? Did they know that? I don't know. I don't know exactly. I haven't reviewed necessarily all of the bait stamp material that they have received in this case. But I don't know that that would be necessarily. How could that not be Giglio? The guy's getting $5,000 a month? I mean, this is for the first time this is being raised right now, but I guess I have. But Brady and Giglio have been in this issue from day one. So I'm just asking you whether you know if the defense ever had that impeachment evidence. I would have to file a supplemental brief and evaluate. No, I'm just asking if you know presently. Do you know whether or not the defense knew what Nyan told the government, which is that he bribed officials for the Zetas? Did they know that, to impeach him with it? I would have to compare that with the materials that were sent out. When they do try to cross him, isn't it true that Nyan over and over again says you're lying to the defense attorney? On some occasions. I don't know that he says it over and over. He does acknowledge some misstatements that he made or say that he cannot remember. That's true. But I would like to say the specific parts of the exculpatory and the defense theory of coercion, which, again, the defense theory of coercion, as we put in our brief, it doesn't negate any element of the offense and a justification defense wasn't raised. But even in support of that, when I evaluate the record, there's 13 witnesses just raising 49 references in the record that show how violent the Zetas were, how ruthless Zeta 40 was. So there's ample evidence in the record as far as the materiality determination. But the point they need to do is they need to say, ladies and gentlemen of the jury, you've heard from Mr. Nyan. He implicates my client in being a partner in crime with money laundering with them. But don't believe him because he was bribing government officials. He was receiving $5,000 a day. Instead, when I look at the cross, the only impeachment evidence they've got are the statements he makes to the probation officer that end up in the PSR. Your Honor, if I may, in Nyan's testimony, he stated he was afraid to go to Mexico, that Chispa was murdered, that Nilo directed Nyan, defendant, and Tavo to go to Tampico, and that he felt he had no option to go, that Tavo was killed. This is Nyan. I know, but see how he's telling them I was fearful. But instead what he told the agents was I was a full participant, $5,000 a month from the Zetas. There's no doubt from the trial record that he is a full participant in this crime. He admits that. He's on the phone while they're ordering hits that are made. He admits that he's trafficking drugs across the border. He's admitting full culpability that he's purchasing these horses and is involved in the money laundering operation. So you're saying the impeachment was complete regardless of whether there might have been material impeachment that wasn't turned over? I don't know that this is definitely not material impeachment. It's not clear error. Okay. What case do you have that a flip witness was receiving $5,000 a month from the conspiracy, and that's not material impeachment? What case anywhere in the country would say that's not material? First of all, I don't know that that was not in the disclosure that the AUSA sent. I have not evaluated whether that was. Okay. What disclosure did the AUSA ever send anywhere in the record? Your Honor, I would just, I would implore you and I would. No, I'm asking you a specific question. When you say you don't know if it was given, what, anywhere in the record, any disclosure about Nyan, any? Okay. First of all, it is cited in my brief and I'm happy to supplement it. But there is overwhelming disclosure sent in this case. There are multiple letters. About Nyan's statements? Mr. Gardner sent forth, included all of his disclosure letters to defense counsel about all of his disclosure. And there was a wealth of evidence about Mr. Nyan. There was his pre-sentence. His proffer letter, his plea letter that he was going to get legal status. But I don't think you turned over any of his statements ever. Now, the only cite you gave was to the defense attorney's letter saying, well, they knew the true friend comment. That's the only cite that I saw anywhere. And as to that point, did that, did the defense letter saying give me Giglio that says we received vague reference to true friend, did that even tell them that Nyan made that statement? The jurors did. The question is, did that disclosure indicate that Nyan was the one that said he heard Trevino say we're not true friends? Yes or no? I'm not sure. Nyan never heard Trevino say that. Nyan said he wasn't at the meeting in Tampico. So the 302s do not have Nyan saying that he heard Trevino say we're not friends? No, he was never there. He was getting, even in the reports, he said I wasn't there. He went to the meeting, he came back, and that's how he discovered it. The defendant was the only person who returned alive from that meeting. But the only, okay. And there was no doubt for the jury that Nyan was profiting. It wouldn't be that he was profiting from his participation in the conspiracy. He was rolling in the money. He was clearly earning money from drugs and from the money laundering operation. The fact that he was receiving $5,000 a month from, I mean, there was no misconception about the jury about Nyan's involvement and his profiting from the conspiracy. Did the defense elicit that from Nyan in its cross of him, saying you told the government you were receiving $5,000 a month? Did they ask that question? Not that specific amount, but that's not the materiality determination. What's your case that says that specific thing is not Giglio? What case? I can't imagine there would be one. Well, the cases I'm discussing are material. I mean, I'd really like to move on to other things. I think we have a disagreement. Well, I'm asking you for the case that stands for that's not material. So don't move on until you give me any case. It's not material in the context of the entire trial. That's a harmlessness argument. It's not a harmlessness. Materiality is did it put the whole case in such a light as to undermine confidence in the verdict? I mean, that's even stronger than a harmlessness argument. It's not one piece of argument. Doesn't that require looking at the entire trial? It does. And that's why I don't go back to my point. I understand how Judge Walter could have made a materiality. Is it the government's position that even if something's favorable to the accused, you don't have to turn it over if before the case or during the case the government decides, well, I don't think the way the trial is going to play out, it's going to end up making a difference? I would like to answer the question, but I'm not sure I understood your question. If you could just rephrase it. I'll phrase it the different way. Isn't the government obligated to turn something over that's either exculpatory or impeachment evidence? Absolutely. Without assessing whether it's actually going to make a difference in the trial? Absolutely. This isn't a horse race. We have plenty of time this morning, so I'll give you additional five minutes. Thank you. I think that, you know, the record is clear on this issue as far as what the government's position is, and that's fine. But I did want to address briefly the commingling instruction because I do feel like the briefs maybe misstated what Judge Walter's ruling was in that case. And I hope the court is not left with a misimpression that he felt that he had to give the commingling instruction based on this court's opinion. I would like to direct the court's attention to 9042 of the record where he said, where defense counsel renewed its objection and said the court did not say you had to give this. And Judge Walter's response is sort of, well, they did say if there's evidence of it, here's what you say. So I just wanted to correct any sort of misconception about what the court's ruling was as far as that, and I believe that the court's ruling was reasonable. I don't know if the court has specific questions on the commingling or if they're just excited about the Brady issue. Concerned, obviously, about the Brady issue. I also believe that the government's belief is that the commingling instruction was correct in light of this court's ruling in CESA 1, and as far as my Rule 28J letter reiterates, that this court has often permitted the giving of permissive instructions. And I think that the Ninth Circuit case cited by the defendant in his reply brief is based on the court's supervisory powers not to give permissive instructions, and the Fifth does not follow that line of cases. They have allowed permissive instructions as long as it's not unduly shifting the burden to the defendant. I would also like to note that even though Judge Walter did overrule the objection to the prosecutor's comment, its instruction to the jury was, in a sense, curative. So it might have overruled him technically, but the instruction was very curative as far as laying out what the instruction was, and it was actually very similar to the Ninth Circuit's holding in Hauser, how it instructed it, where Hauser distinguishes it from its prior case law. So if the court doesn't have any further questions of me, I would just ask you to affirm the judgment and sentence. Thank you. Roberts. Your Honor, I suspect you're going to have some questions for me about the record, but I'll begin. Well, I guess, I mean, you're nice to invite me to ask, and in your closing argument, I read, ladies and gentlemen of the jury, you know, they're asking you to believe that Nyan is, quote, a murderer, a drug dealer. Nyan is a murderer, a drug dealer, a liar, a thief, an extorter, and probably a kidnapper, and he's going to get set free in exchange for lying. I guess then once, if you had the ammunition to make that closing statement, pretty much anything would be harmless or, in their view, maybe immaterial. Any further impeachment? I utterly disagree. But that's a pretty devastating closing argument, which you built on the cross you were able to make. Well, it wasn't very persuasive with the jury. They convicted in two hours. I think the jury believed Nyan. I think that argument fell flat, and the reason it fell flat is that certainly Nyan admitted that he was a criminal, but he was, like so many cooperators with the government, he was a reformed criminal. He was here to tell the truth. That was part of his deal, and we had nothing really to challenge him on that. I know, but that isn't really how you presented your giggly argument to us. I went off, I mean, just because this is a worrisome area of law, the discovery, and when the government takes a critical witness and assigns people to write notes and generate 302s later so nothing becomes Jenks, nothing is Brady Giglio. The court at first is asked to take it in camera. The government opposes that. We're asked to disclose that the government opposes that. I worry a lot about witnesses becoming invulnerable because there's no discovery, and then defense attorneys are in a predicament. They're in the dark. However, you've had it all. To write your supplemental brief, you had everything, and you've told us it's the true friend problem and it's the cash payments. But the true friend issue you did in your own defense letter, you know, you said we knew it, and then the cash payments, when you look back at Lawson testifying in the first sentencing, that comes out. You knew that the cash payment remarks hadn't come up until later interviews. So tell me where I'm wrong on that analysis. Well, let me begin by saying there was some question when you were talking to the government about whether notes constitute Brady material. They clearly do. Well, they do, and the 302s referred, and it said they were attaching them, and I don't think Judge Walters ever got them. So it mystifies me. One of them says that the interview is stopping and the IRS's notes will be the rest of the interview, but they don't seem to be attached and submitted to Walters. So it's not something, as you could hear, that I have any ability to understand on the government side. But how does this prove that it's a reversible conviction? All we had in terms of the fear issue was some vague information that Zeta 40 had said this to Colorado. That's useless as far as impeachment. The cross didn't even mention it for just that reason, because it is useless for impeachment. What we should have had is the FBI 302 containing that comment, so that if Nayin denied it on the stand, he could have been ‑‑ the agent could have been called and he could have been impeached. But beyond that, that was just the tip of the iceberg. Nayin testified. How are you going to impeach him with the agent's 302 if the agent has to say I wasn't there seven months earlier when he made the statement? The only person that would have to become a material witness would be the trial prosecutor that took the notes. Do you agree with me or am I wrong? Unless the prosecutor would stipulate that the agent could testify. But how could the agent testify if he hadn't been at the interview? Well, he would have to testify from the notes. I agree that it's a problem, but it's a problem we could have dealt with if we'd known that it existed. We just didn't know it existed. But in terms of the fear evidence, what's critical here is that Nayin didn't just ‑‑ it wasn't just this one comment at one meeting, because Nayin's ‑‑ the government's theory was they got off on sort of the wrong foot in 2007, but then everything was fine after that. That's not what Nayin said at these meetings. He said Colorado was in constant fear of Zeta 40, constant. And he said that throughout his relationship with Zeta 40, this is Nayin speaking. But how does just that he's fearful? If he still accepts their money and money launders, he still is guilty? Because he didn't accept their money. Here's why it's important, Your Honor. I thought your premise was he's so terrified he is taking their money. No. Either way, no? No, no, no, no. Oh, your argument is that he's fearful, he doesn't take their money, he uses his ADT money. Yes? Yes. But is it true that in the 302s, Nayin says, oh, well, he got the ADT money by bribing PEMEX officials. They didn't even use that as 404B. The judge kept it out, actually. They tried to get it in. Oh, they did? No. Huh. Okay. That was what Nayin said. But in a way, I mean, the reason the judge kept it out is it really is 404B. It's got nothing to do with anything. Nayin wasn't saying he used drug money to bribe PEMEX officials. At least I don't think that's what he was saying. Right. He was saying he just bribed PEMEX officials. That's how he got his contract. Well, that's unrelated misconduct if it occurred at all. Excuse me. Yes. Did you give him five minutes? I gave the prosecution five minutes, so I'll give him another five, so equal time. Unless you don't want him. No, no. I'm happy to have it. But I briefly lost my train of thought. That's all right. You asked for it in camera. They gave it in camera. The district judge looks at it and says there's nothing helpful here. You're saying there are powerful bits and pieces that are helpful here, and yet you had some intuition about them, we know, from your discovery letter. Just one piece, one little piece. Yes, I know. And what we didn't have was, because, again, you've got to understand, the whole picture of Zeta-40 at this trial was this man's a brutal killer. He killed this person, he killed that person. But, and this was Nayen, this was solely Nayen, he and Colorado were pals. In fact, he protected Colorado. Colorado didn't have to drive around with protection because Zeta-40 looked out for it. And the testimony or the statements are completely contradictory to that. Now, I know where I got off. You were asking me sort of why that's important. The theory was, it wasn't just a theory, this is what we said happened. Colorado, like Alfonso Del Rio, who was another person who got extorted by the Zetas, Colorado used his own money to purchase these horses. And we put on Susan Hartman, a forensic accountant, to testify about that. We called Colorado's banker to testify that big cash infusions didn't come into his account. He used his own money to buy horses for the Zetas. That was what we said. Well, then the logical next question is, why on earth would you do that? Why are you going to use your, that doesn't make any sense, why are you using your own $10 million of your own money to buy horses for the Zetas? That's where the fear part was important. The jury's not going to believe you're going to spend your own money to buy horses for the Zetas. Wasn't the evidence from Nayen and everybody that everybody's terrified of the Zetas? It's just, no one's, no? Not Colorado. His testimony was, he scoffed at that. I mean, that's why this is so important, Your Honor. Nayen, on the stand, scoffed at the idea that Colorado would be intimidated or afraid of the Zetas. He scoffed at it. He said, never, they're friends. That was his testimony at trial. And if you look at his statements, it's totally contradictory. He never once says that Colorado and Zeta-40, in nine interviews, he never says that they were friends. He says Colorado was in constant fear. He says Zeta-40 always wanted to kill him throughout their relationship. From 2007 to 2012, how can that not be Brady? Brady, exculpatory. No intent to join. He didn't have the intent to commit money laundering? Exactly. He was like Bill Ryle, who was forced, he got beaten, unlike Colorado, but he was forced to use his own money to buy horses for the Zetas. That was Colorado's situation. I think I've used all my time. I'm happy to answer any questions if there are any, but I know we've gone over. Thank you. Fine. Thank you.